UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 3:17-CR-173-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| RODERICK MASON, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Defendant. | ) | **MOTION TO SUPPRESS** |
| | ) | **EVIDENCE** |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant Roderick Mason's Motion to Suppress evidence obtained during a traffic stop on August 2, 2017. [R. 25] The United States responded in opposition. [R. 30] The Court held an evidentiary hearing (the "hearing") on June 1, 2018. [*See* R. 31] The parties filed post-hearing briefs [R. 45, 47]. The defendant also filed a Motion to Supplement the Record in Support of his Motion to Suppress [R. 52], and the United Sates filed a Response in Opposition [R. 53]. The matter is ripe for consideration.

Having considered the testimony and the full record, the Court **DENIES** the defendant's Motion to Suppress [R. 25], and **DENIES** defendant's Motion to Supplement the Record [R. 52]. The stop was lawful under multiple analyses, and there is no basis for suppression of the evidence obtained on August 2, 2017.

I. **FACTUAL BACKGROUND**

The record in this matter is comprised of the transcript of the hearing [R. 37] and a single exhibit. [R. 45, United States' Resp., Ex. 1, Uniform Citation] Only two witnesses testified at

1

this hearing -- both officers of the Louisville Metro Police Department ("LMPD") who were involved in the arrest of the defendant. Their testimony is summarized below.

### A. Testimony of Sergeant Paul Neal

Sergeant Paul Neal ("Sgt. Neal") is an officer with the LMPD with over 18 years of experience. [R. 37, Transcript, at p. 5, ll. 6-20, Page ID #:77] He is a narcotics sergeant currently assigned to the Complaint Response Unit, supervising between five to eight narcotics detectives. *Id*. at ll. 21-25. He supervises these detectives and their investigations, and also lends assistance with their narcotics investigations. *Id*.

The investigation that gave rise to Defendant Mason's arrest began around midday on August 2, 2017. Sgt. Neal was conducting surveillance on the 1300 block of Cleo Avenue since he had "information on drug activity in that area." *Id*. at p.7, ll. 11-18, Page ID #:79. Shortly after Sgt. Neal had begun his surveillance, he noticed a dark blue sedan pull into the driveway at 1314 Cleo Ave. and park. *Id*. at p. 8, ll. 1-2, Page ID #:80. At that point, a male (later identified as Defendant Quentin Black) exited the vehicle wearing bright pastel clothing and entered the residence. *Id*. at ll. 6-14. He was there about 10 minutes before another car pulled up onto the street. *Id*. at ll. 20-25. Sgt. Neal testified that the second car sat outside of the residence for approximately 10-15 minutes. The car carried two passengers, one male and another female (later identified as Defendants Roderick Mason and Abbie Edwards). *Id*. Then, the first man (Black) re-appeared from the residence, stopped at his own car and reached in, then spoke briefly to the two passengers (Mason and Edwards) before getting into the back of their car. *Id*. at p. 9, ll. 14-25, Page ID #:81. When Black exited the residence, Sgt. Neal noted the odd way he was carrying a coffee mug as if it did not contain coffee (or else it would have spilled). *Id*. at p. 10, ll. 1-25, Page ID #:82, p. 11, ll. 1-9. Page ID #:83. Sgt. Neal testified that based on his 23 years

of police experience (15 in narcotics), he began suspecting that this was a narcotics transaction. *Id*. Once Black entered Mason's vehicle, Edwards and Mason turned to speak to him. Sgt. Neal waited at this point so that he could "see what happen[ed]." *Id*. at p. 11, l. 7, Page ID #:83. He noted that he did not think that Black had on what appeared to be work attire. *Id*. at p. 11, ll. 10-14, Page ID #:83. The three did not drive off together, but remained parked outside of 1314 Cleo Ave. with Black in the back seat, further raising Sgt. Neal's suspicions. *Id*. at p. 11, ll. 7-25; p. 2, ll.1-2. At that point, Sgt. Neal called one of the narcotics detectives he supervised, Detective Jonah Kiper ("Det. Kiper"), and detailed what he had observed. *Id*. at p. 12, ll. 3-9, Page ID #:84. Det. Kiper was not nearby, but began making his way towards the area to assist the investigation.

Sgt. Neal testified that his suspicion at this point was based on the "totality" of circumstances:

> Well, again, it was the totality of the -- the totality of everything is building at this point not so much Mr. Black showing up and going into the residence, but when he came out of the house, the way he was carrying the cup, what he's wearing, the time of the day. Mr. Mason and Ms. Edwards arrive. They park on the street. He's talking on the phone. They're waiting for about ten minutes. Mr. Black comes and gets into the back seat of the vehicle with them. They engage him in what appears to be a conversation. They don't immediately leave, like they're all three going somewhere, and then -- so all of that stuff is raising my suspicions at that point.

*Id*. at p. 12, ll. 11-23. After remaining in the vehicle with Mason and Edwards a brief time, Black exited the vehicle and returned to his sedan. Both cars then turned to leave the neighborhood. Sgt. Neal followed the vehicles and noticed that Black's vehicle had a Florida license plate. *Id*. at p. 13, ll. 23-25, Page ID. #:85. Sgt. Neal testified that this detail further raised his suspicion because from his experience in narcotics investigations, "[drug] traffickers and that sort of thing" often rent vehicles. *Id*. at p. 14, ll. 1-6, Page ID. #:86.

Sgt. Neal maintained constant communication with Det. Kiper, who was traveling to their location. At the end of the neighborhood, Black's vehicle turned left, and Mason and Edwards

3

turned right. Sgt. Neal elected to follow Mason and Edwards, suspecting them to be the recipients of possible contraband. *Id*. at p. 14, ll. 10-23, Page ID. #:86. Sgt. Neal followed the vehicle carrying the defendants for a while and observed it make a stop at a business called Dad's Custom Audio. *Id*. at p. 16, ll. 6-24, Page ID #:88. Shortly thereafter, Det. Kiper, driving a separate vehicle, arrived in the area and joined Sgt. Neal's investigation. At this point, Sgt. Neal passed Mason's vehicle and observed that Mason was not wearing a seatbelt. *Id*. at p. 18, ll. 17-20, Page ID #:90. He relayed this to Det. Kiper. *Id*. At this point, Det. Kiper took over the investigation and conducted a traffic stop (after he too, observed that Defendant Mason was not wearing his seatbelt). Sgt. Neal testified that he observed the entire traffic stop while parked nearby, and the arrest took around 10 minutes total. *Id*. at p. 20, ll. 21-25, Page ID #:92.

On cross examination, Sgt. Neal clarified why the circumstances surrounding the defendants' brief exchange in Mason's vehicle roused his suspicion. He explained that if the defendants were simply having a conversation, they could have done so while Black was standing at the driver's window. *Id*. at p. 29, ll. 18-25, Page ID #:100.

On re-direct examination, Sgt. Neal testified that the reason he did not conduct the traffic stop himself was so as not to blow his cover as he was continuing an ongoing narcotics surveillance of the area from which the defendants had just come. *Id*. at p. 38, ll. 16-22, Page ID #:110.

### B. Testimony of Detective Jonah Kiper

Det. Kiper testified next at the hearing. He has been with the LMPD since 2009, and a detective since 2014. *Id*. at p. 42, ll. 2-6, Page ID #:114. Det. Kiper testified that on the afternoon of the defendants' arrest, he was made aware of the events by Sgt. Neal as they happened in real time. *Id*. at p. 43, ll. 7-8, Page ID #:115. Once he was able to obtain a visual on

the vehicle in question, he began to follow it. *Id*. at p. 44, ll. 9-25, Page ID #:116.  Soon thereafter, Sgt. Neal pulled up alongside him and informed him that the driver of the vehicle in question was not wearing a seatbelt. *Id*.  Det. Kiper confirmed this: "So I confirmed what he saw, the driver wasn't wearing a seatbelt." *Id*. at p. 44, ll. 2-8, Page ID #:117.  Det. Kiper activated his lights, and pulled the vehicle over at a Marathon gas station. *Id*. at ll.18-24.

Once he made contact with the driver (Defendant Mason), Det. Kiper told the driver that the reason for the stop because the driver had not been wearing a seatbelt. *Id*. at p. 46, ll. 3-25, Page ID #:118.  Det. Kiper further testified that the LMPD's "other reason" for pulling them over was that their car matched that of one that had fled a shoplifting scene nearby. *Id*.  Det. Kiper clarified that this "other reason" for pulling over the defendant's vehicle was a "fictitious story." *Id*.  Det. Kiper explained that the LMPD gives these "fictitious stories" to persons suspected of narcotics trafficking to avoid compromising the Department's undercover narcotics surveillance efforts. *See id*.  Det. Kiper asked the two defendants where they had just come from. *Id*. at p. 47, ll. 4-24, Page ID #:119.  The defendants responded that they had just bought food. *Id*.  When asked if they made any stops along the way after getting food, the two defendants both answered that they had not. *Id*.  Det. Kiper asked a second time if they made any stops along the way. *Id*.  Again, the defendants denied stopping anywhere. *Id*. However, through Sgt. Neal's direct observations and communications, Det. Kiper knew that the two defendants made at least two (2) stops – at the Cleo Avenue residence and at Dad's Custom Audio. *Id*. at p. 48, ll. 1-3, Page ID #:120.  This increased Det. Kiper's suspicion further. *Id*.

At that point, Det. Kiper asked for consent to search the vehicle for "any drugs, any guns, any weapons, anything of that nature . . ." *Id*. at ll. 6-22.  Det. Kiper testified that Mason replied, "[t]hat's fine, you can search." *Id*.  He asked the defendant to step out of the vehicle.  At that

5

point, Detective William Garrett ("Det. Garrett") of the LMPD joined the search. *Id*. As Det. Garrett watched Mason, Det. Kiper returned to the vehicle and informed the passenger (Edwards), that he was performing a search of the vehicle, and asked that she step out of the vehicle. *Id*. at p. 49, ll. 1-3, Page ID. #:121. Det. Kiper testified that the first thing that caught his attention was a red purse that was "partially shoved under [her] seat." *Id*. at ll. 6-25. At that point, Det. Kiper unzipped the top of it and found two large packets of "what appeared to be crack cocaine" lying directly on top of a wallet. *Id*. Det. Kiper described each packet as "about the size of a golf ball." *Id*. By feel, each one appeared to be about an ounce. *Id*. Based on his experience of conducting narcotics investigations, Det. Kiper testified that this amount of crack cocaine was atypical of personal use. *Id*. at p. 45, ll. 3-25, Page ID. #:122. Further, there was no paraphernalia indicative of a single user, suggesting that these packets were meant for distribution or further sale. *Id*.

The stop served two purposes, to address the seatbelt infraction and to "get to the bottom of what we -- what Sgt. Neal had witnessed, what had transpired, whether it was a narcotics transaction or something else." *Id*. at p. 52, ll. 5-13, Page ID. #:124. Det. Kiper attested that both he and Sgt. Neal had witnessed the driver not wearing his seatbelt. *Id*. at p. 45, ll. 4-8, Page ID#: 117; p. 51, ll. 21-25, Page ID. #:123. Following a brief exchange, Det. Kiper again testified that he asked for and received the defendant's consent to search the vehicle. *Id*. at p. 52, ll. 5-13, Page ID. #:124. Sgt. Kiper estimated that from the time he first spoke to Defendant Mason to the time he discovered the narcotics in the red purse, about five (5) minutes had passed.[1] *Id*. at p. 53, ll. 1-9, Page ID. #:125. Once Sgt. Kiper discovered the narcotics in the purse, he and Det. Garrett put the defendants in handcuffs and placed them under arrest. *Id*. at p. 53, ll. 12-25, Page ID. #:125.

---

[1] On cross-examination, Det. Kiper was asked about the seatbelt violation at issue in this case. He testified that a routine traffic stop for a seatbelt violation can take up to 20 minutes. *Id*. at p. 59, ll. 1-13, Page ID. #:131.

6

Less than a minute transpired from the time Sgt. Kiper discovered the narcotics to when the defendants were placed under arrest. *Id*. at p. 54, ll. 18-20, Page ID. #:126.

On cross, Det. Kiper testified that his department uses "various reasons to stop [suspected drug dealers], whether it's running a stop sign, not using a turn signal, not wearing a seatbelt, a pretextual stop . . . . [Mason] just happened to not be wearing a seat belt." *Id*. at p. 60, ll. 7-19, Page ID. #:132. And with each stop, Det. Kiper "can pretty much guarantee that I'm going to ask consent to search the car." *Id*. Det. Kiper also testified that he is "not required to tell [the defendants] they have the right *not* to consent [to the search of the vehicle]." *Id*. at p. 62, ll. 20-21, Page ID. #:134 (emphasis added).

Next, Defense counsel questioned Det. Kiper regarding the time of arrest and accompanying citation. *See generally id*. at p. 67, Page ID. #:139; [R. 45, United States' Resp., Ex. 1, Uniform Citation] The Citation indicates that the time of violation was 1:00 p.m. *Id*. Yet, the same citation indicates that the time of arrest occurred some three (3) hours later, at 4:17 p.m. *Id*. In his testimony, Det. Kiper explained that he completed the written report of the incident with the defendants around 4:00 p.m, though the time of the violation was actually 1:00 p.m. [R. 37, Transcript, at p. 68, ll. 15-23, Page ID. #:140] He further testified that the actual time of the arrest was "as soon as [the LMPD] found narcotics, within a minute or two." *Id*. at pp. 67-68, ll. 24-25, 1-6, Page ID. #:140-41. Det. Kiper testified that the program the LMPD uses to generate the Uniform Citation templates auto-fills the time of the citation based upon when the reporting officer is drafting the report. Unless the officer manually changes this time, it will remain on the citation. *Id*. The defendant called no witnesses to refute any of the testimony from the United States.[2]

---

[2] It is this discrepancy between the time of violation and time of citation issuance that forms the basis of Defendant Mason's Motion to Supplement the Record in Support of his Motion to Suppress [R. 52]. Defendant seeks to introduce

7

Once the narcotics were found, within a minute or less, Det. Kiper placed Mason and Edwards under arrest. *Id*. at p. 54, ll. 18-22, Page ID#:126. Once the defendants were placed under arrest, but before either were read their *Miranda* warnings, Det. Kiper conducted "brief questioning" with the defendants, and asked them to whom the narcotics belonged. *Id*. at p. 69, ll. 17-21, Page ID. #:141. Both defendants denied ownership. *Id*. at p. 126, ll. 10-17, Page ID#: 126.

II. ANALYSIS

Mason cites three grounds for suppression of the cocaine evidence: (1) the stop was not authorized by an exception to the warrant requirement; (2) Mason's arrest was not supported by probable cause; and (3) the "prolonged detention" and questioning of Mason were constitutionally impermissible, invalidating any alleged "consent" to search. [*See* R. 47, Def. Memo., at pp. 3-10] As outlined below, the Court rejects each of these arguments.

A. The Stop Was Valid on Two Bases

The Fourth Amendment protects against not only unreasonable searches, but also unreasonable seizures. *United States v. Avery,* 137 F.3d 343, 348 (6th Cir. 1997). A traffic stop by a police officer is a "seizure" within the meaning of the Fourth Amendment. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Evidence seized illegally during a stop will not be admitted at trial. *Id.* As to vehicular concerns, the Sixth Circuit has held that, "[i]n order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Rios*, 830 F.3d 403, 429 (6th Cir.

---

the Uniform Citation of Defendant Abbie Edwards into the record for the Court's consideration on the issue of whether the duration of the stop was prolonged. [*See* R. 52, p. 2] The exhibit the defendant seeks to introduce also bears the time of citation of 4:17 p.m., but this citation is hand-written, not computer-generated. Thus, the defendant's argument is that this evidence "supports the occurrence of a 3-hour delay between 'time of violation' and 'time of arrest' of Mason." *Id*. As the Court will explain in the following section, the Court is satisfied that the Government has satisfied its burden of proving that the duration of the stop in question was not unreasonable. The defendant's motion will be denied.

8

2016) (quoting *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)). Because the Court finds that Sgt. Neal and Det. Kiper had *both* probable cause to believe a traffic violation had occurred, *and also* had a reasonable, articulable suspicion of criminal activity, the resulting stop does not violate the Fourth Amendment.[3]

Probable cause requires "more than mere suspicion" but not "evidence to establish a prima facie case . . . much less evidence sufficient to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). The Court must determine whether "the facts and circumstances within [the officers'] knowledge and of which [they] had reasonably trustworthy information [are] sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010) (internal citations and quotations omitted).

The unrefuted testimony from Sgt. Neal and Det. Kiper at the evidentiary hearing establishes that the officers had probable cause to believe that Mason was in violation of KRS § 189.125(6).[4] Both officers observed the defendant not wearing a seatbelt, and Mason offered no evidence to challenge that. The initial seizure on this basis alone was lawful.[5] *Rios*, 830 F.3d at 429 (6th Cir. 2016).

The Court also finds that Det. Kiper had a reasonable suspicion of criminal activity, justifying an investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

---

[3] Det. Kiper testified that he stopped the defendants' vehicle for two reasons: (1) to effectuate a traffic stop based on the observed seatbelt violation [R. 37, Transcript, at p. 46, ll. 3-25, Page ID #:118]; and (2) to "get to the bottom" of Sgt. Kiper's investigation of a suspected narcotics transaction. *Id*. p. 52, ll. 5-13, Page ID. #:124.

[4] This statute provides in relevant part "[a] person shall not operate a motor vehicle manufactured after 1981 on the public roadways of this state unless the driver and all passengers are wearing a properly adjusted and fastened seat belt . . ."

[5] That the stop was also part of a drug investigation originally started by Sgt. Neal does not change the analysis. The probable cause standard is objective. "Subjective intentions play no role in probable cause Fourth Amendment analysis." *Schneider v. Franklin Cnty.*, 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren v. United States*, 116 S. Ct. 1769, 1773-74 (1996)).

(1968). Under *Terry*, "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994); *United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004). Reasonable suspicion "must be supported by specific and articulable facts that would 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008) (quoting *Terry*, 392 U.S. at 21-22). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). Whether a reasonable suspicion exists is based on "the totality of the circumstances." *Id*. (internal quotation marks and alteration removed).

Further, an officer's reasonable suspicion may be derived from information communicated to him from other officers. *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012) ("It is well-established that an officer may conduct a stop based on information obtained by fellow officers."). A seizure conducted in reliance on another officer's observations does not violate the Fourth Amendment so long as the officer conveying the information possessed the necessary reasonable suspicion. *Id.* at 766; *see also United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014).

The record is clear that during Sgt. Neal's initial surveillance and pursuit, he was in constant communication with Det. Kiper, and described the following observations to Det. Kiper: (1) Sgt. Neal had been conducting surveillance in a block of Cleo Drive reported to have ongoing drug activity; (2) during his surveillance, he saw a male, later identified as Quentin Black, park in the driveway of a house on Cleo Drive and walk inside; (3) he then observed

10

another car pull up to the front of the house and park (it was later determined that Roderick Mason was the driver and Abbie Edwards was the passenger); (4) Mason and Edwards sat in the car between 10-15 minutes without ever getting out; (5) Sgt. Neal then observed Black leave the residence holding a coffee mug, briefly stop by his car in the driveway, and reach inside before approaching the car driven by Mason; (6) Sgt. Neal became suspicious of the way Black held the coffee mug, titled to the side, as if it did not contain any liquid (else it would have spilled out);[6] (7) Black then got into the back seat of Mason's car and appeared to talk with Mason and Edwards, but the car did not drive off; (8) instead, Mr. Black remained in the car for about one minute, then exited the vehicle and got into his own car; (9) both vehicles left the area essentially at the same time, and Sgt. Neal observed that the vehicle driven by Black had a Florida license plate.[7] In addition to having probable cause to stop Mason for a traffic violation, the foregoing observations also demonstrate the stop was a valid *Terry* stop, based on a reasonable suspicion of drug activity, supported by specific, articulable facts. *Bentley*, 29 F.3d at 1075-76 (6th Cir. 1994); *see also United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008) (finding reasonable suspicion where defendants actively avoided police officer, knew their rental car was several weeks overdue, knew their licenses did not match their claimed residences (lying) and were observed to be increasingly nervous during interrogation); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (upholding officers' reasonable suspicion when defendant, among other things, appeared nervous, seemed to try to avoid being questioned, seemed to have drug paraphernalia in his vehicle, and had a large amount of cash).

---

[6] After witnessing all of the events, the Court concludes that Sgt. Neal's inference that the coffee mug was likely a vessel used to transport the drugs in this case is also a reasonable one.

[7] According to Sgt. Neal's testimony, from his extensive experience investigating narcotics transactions, out-of-state plates could indicate a rental car, which is commonly used by narcotics traffickers. [R. 37, Transcript, at p. 14, ll. 1-6, Page ID#: 86]

Once the stop occurred, Det. Kiper's suspicions increased. Det. Kiper advised Mason he had pulled him over for failure to wear a seatbelt, and he also made up a fictitious story about a vehicle matching the description of Mason's being involved in a shoplifting incident. *Id*. pp. 45-47, Page ID#s: 117-19. When Det. Kiper asked where they had come from and if they had made any stops, neither Mason nor Edwards mentioned the stop at Cleo Drive or the stop at the car audio store, further increasing Det. Kiper's suspicions. *Id*. at p. 47. ll. 13-19, Page ID#: 119.

### B. The Officer Had Probable Cause to Arrest Mason

After briefly questioning Mason concerning his whereabouts, Det. Kiper asked Mason for consent to search the vehicle, and Mason consented. *See id*. at p 46, ll. 9-10, Page ID#: 120. The first thing Det. Kiper noticed when Edwards exited the car was a red purse partially shoved under the front passenger seat. *Id*. at p. 49, ll. 6-10, Page ID#: 121. Upon opening the purse, Det. Kiper found two large packets of what appeared to be crack cocaine lying on top of a wallet. *Id*. at ll. 11-25. At that point, Det. Kiper placed both suspects under arrest. *Id*. at p. 53, ll. 12-18, Page ID#: 125.

But for a vague and wholly unsupported reference by Mason that he did not consent to the search [*See* R. 47, Def. Memo., at p. 10], there is nothing in the record to challenge Det. Kiper's testimony that Mason consented. Instead, Mason argues that his arrest violated the Fourth Amendment because the officers lacked probable cause to arrest him as there was "no . . . reasonable inference that Mason had knowledge or access to the contents of Edwards' purse . . . There is no evidence that Mason was aware of or criminally responsible in way [*sic*] for the content of Edwards' purse." [R. 47, Def. Memo., at p. 7] For support, Mason cites *Maryland v. Pringle,* 540 U.S. 366 (2003). *Maryland v. Pringle* fails to support his argument.

12

In *Pringle*, like here, a police officer stopped a vehicle carrying multiple occupants for a civil violation (speeding). When the driver opened the glove compartment to retrieve his registration, the officer observed a large amount of rolled-up money. The officer then asked the driver to get out of the car to issue him a verbal warning and asked if there were any weapons or narcotics in the vehicle. The driver indicated no. The officer then requested consent to search, and the driver consented. Five plastic baggies containing cocaine were found behind the back-seat armrest. The officer arrested all three passengers. Joseph Pringle, seated in the front of the vehicle, challenged the legality of the arrest, arguing that the officer lacked probable cause to arrest him because the drugs could have belonged to the other passengers. The Supreme Court found that the officer had reasonably attributed criminal activity to *all* the passengers given the circumstances:

> Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Pringle*, 540 U.S. at 373 (2003). The Court held it was reasonable to infer that Pringle was dealing drugs along with the other passengers, even though Pringle was seated in the front passenger seat and the drugs were located behind the rear arm rest. *See id.*; *see also United States v. Montgomery*, 377 F.3d 582, 590 (6th Cir. 2004) (upholding the common enterprise principle found in *Pringle* in facts analogous to *Pringle*); *United States v. Dellosantos,* 536 F.3d 155, 159 (2d Cir. 2008) (common enterprise of drug trafficking to all passengers of vehicle).

Likewise in this case, it was reasonable for Det. Kiper to infer that both Mason and Edwards were engaged in drug dealing upon finding crack cocaine in the red purse. Mason and Edwards were together the entire time that Sgt. Neal observed what he believed to be a narcotics transaction. When questioned, Mason and Edwards both lied to Det. Kiper about their recent

13

whereabouts. Further, the crack cocaine was found within reach of Mason, in Edwards' purse located partially under the passenger seat. Det. Kiper testified that from his experience the quantity of drugs discovered was not consistent with personal use. Instead the amount recovered indicated the likelihood of drug dealing. *Pringle*, 540 U.S. at 373. Based on this evidence, Det. Kiper could reasonably conclude that the two defendants were working in concert to traffic narcotics. Probable cause existed to arrest Mason.

### C. The Brief Detention and Questioning of Mason Was Not Constitutionally Impermissible and Did Not Invalidate the Consent to Search

Mason argues that the stop and questioning by Det. Kiper was impermissibly "prolonged" and therefore invalidated any "alleged" consent. [*See* R. 52, p. 2] To support this argument, defendant cites to *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). There the Court held that "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S.Ct. at 1611. The Court in *Rodriguez* noted that the Fourth Amendment "may tolerate certain unrelated investigations that do not lengthen the roadside detention." (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (questioning)); *Illinois v. Caballes*, 543 U.S. 405, 406, 408 (2005) (dog sniff). But, the Court held that a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Rodriguez*, 135 S. Ct. at 1611 (2015). The critical question then, is whether the officer's unrelated investigation (e.g., questioning or dog sniff) prolongs or adds time to the stop. *Rodriguez*, 135 S.Ct. at 1616.

Det. Kiper testified that the traffic stop served two purposes – to investigate a traffic infraction that he and Sgt. Neal directly observed, and to effect a valid *Terry* stop based on a suspicion that Mason and Edwards were engaged in drug activity. Under either rationale, there was no prolonged or impermissible questioning that rendered Mason's consent to search invalid.

First, Det. Kiper's uncontroverted testimony at trial was that no more than 5-10 minutes *total* transpired from the time Det. Kiper first approached Mason after he pulled him over until the time he arrested both defendants. [R. 37, Transcript, at p. 53, ll. 1-9, Page ID. #:125] Likewise, Sgt. Neal, who monitored the traffic stop from the parking lot of the Marathon gas station, testified that the entire stop lasted about 10 minutes. *Id*. at p. 20, ll. 21-25, Page ID #:92. Further, Det. Kiper testified that the average stop to issue a seatbelt citation would generally take about 20 minutes. *Id*. at p. 59, ll. 1-13, Page ID. #:131. There was no "prolonged" detention or questioning.

Further, the scope of the questioning was not impermissible. The Court is satisfied that the officers possessed a reasonable suspicion of criminal activity. Det. Kiper's brief questioning related to Mason's whereabouts before being pulled over and his request to search the vehicle were reasonable in scope to the officers' suspicions. *United States v. Bah*, 794 F.3d 617, 626-29 (6th Cir. 2015); *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (citing *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993)); *Foster*, 376 F.3d at 585; [*See, e.g.*, R. 37, Transcript, at p. 47, ll. 4-24, Page ID #:119].

Even if the facts in this case failed to support a valid *Terry* stop, the search was not rendered unconstitutional based on Det. Kiper's brief, limited questioning subsequent to a valid stop to issue a traffic citation. The Supreme Court has held that the Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention. *See Arizona*, 555 U.S. at 333 (questioning); *Caballes*, 543 U.S. at 406, (dog sniff). A traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Id*., at 407. The brief detention was not unreasonable in length or in scope. Det. Kiper testified that a typical traffic stop for a seatbelt violation would take between

15

15-20 minutes. [R. 37, Transcript, p. 59, ll. 1-13, Page ID. #:131]. Here, the entire exchange between Det. Kiper and Mason from the time Det. Kiper pulled Mason over until he placed Mason under arrest was 5-10 minutes. *Id.* at p. 53, ll. 1-9, Page ID. #:125; *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 169, 196 L. Ed. 2d 142 (2016) (citing *Rodriguez,* 135 S.Ct. at 1616–17 and noting that under the circumstances, 21 minutes was not an unreasonable amount of time to complete a traffic stop). The Court finds that under the circumstances, the duration of the stop was not unreasonable.

Det. Kiper asked the defendants a handful of questions related to the defendants' travel prior to the traffic stop. *See* [R. 37, Transcript, at p. 47, ll. 4-24, Page ID #:119] Given the circumstances, these are the type of context-framing questions that are permissible during traffic stops for civil infractions. *See United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("Questions relating to travel plans, the driver's authority to operate the vehicle safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." (brackets, citation, and internal quotation marks omitted)).

Defendant makes an issue about the discrepancy between the time Mason was pulled over (around 1:00 p.m.) and the time listed on the Uniform Citation (around 4:17 p.m.). [R. 45, United States' Resp., Ex. 1, Uniform Citation]; *see generally* [R. 52, Def. Mot. to Suppl. the Record].[8] Det. Kiper explained that he returned to his office later that day around 4:00 p.m. and completed the written citation. [R. 37, Transcript p. 68, ll. 13-23, Page ID#: 140; p. 69, ll. 2-6, Page ID#: 141]. He further explained that the software used to issue the citation auto-fills the

---

[8] As mentioned in n. 2, *supra*, Defendant asks to supplement the record with the hand-written citation of Defendant Abbie Edwards (the passenger), which also reflects a time of arrest of 4:17 p.m. *See* [R. 52, p. 2] Based on the unrefuted testimony of Det. Kiper at the hearing, however, the Court finds that the time of 4:17 p.m. reflects when the officers completed the report for the citation, not the time of the actual arrest.

time when the citation is typed, as opposed to the time the infraction actually occurred (unless you manually change it). *Id*. The Court is satisfied with this reasonable explanation.[9]

Finally, the defendant raises (but fails to develop in any way) whether Mason's consent was voluntary. *See* [R. 47, Def. Memo. in Supp. of Mot. to Suppress, at p. 10] Voluntariness is a question of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, (1973). Det. Kiper testified unequivocally that Mason gave consent to search the vehicle. [R. 37, Transcript, at p. 48, ll. 6-22, Page ID #:120]; *id*. at p. 52, ll. 5-13, Page ID. #:124. The Court finds the testimony from Det. Kiper convincing, and Mason offered no evidence to refute this testimony. The Court finds it was a valid, consensual search.

Based on the following, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant Mason's Motion to Suppress [**R. 25**] is **DENIED**.

2. Defendant Mason's Motion to Supplement the Record [**R. 52**] is **DENIED.**

August 24, 2018

Claria Boom, District Judge
United States District Court

---

[9] Further, both officers testified that the entire arrest took about 10 minutes total from the time the vehicle was stopped to the time the defendants were placed in handcuffs. [R. 37, Transcript, p. 59, ll. 1-13, Page ID. #:131] (Sgt. Neal's testimony); *Id*. at p. 20, ll. 21-25, Page ID #:92; p. 53, ll. 1-9, Page ID. #:125; pp. 67-68, ll. 24-25, 1-6, Page ID. #:140-41] (Det. Kiper's testimony).